IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| J.P., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:21-cv-02427-PX |
| MONIFA MCKNIGHT, *et al.*, | * | |
| Defendants. | * | |

\*\*\*

**MEMORANDUM OPINION**

In this Individuals with Disabilities Education Act ("IDEA") case, K.B. and W.P. as Parents of J.P., a middle school student ("the Parents"), seek reimbursement from Defendants Montgomery County Board of Education and Superintendent Monifa McKnight (collectively, "MCPS"), for the unilateral placement of their child in a non-public special education school from October 5, 2020, until the end of that school year. Presently pending before the Court are cross motions for summary judgment for which no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the following reasons, the Parents' motion for summary judgment is denied (ECF No. 23), and MCPS' motion for summary judgment is granted (ECF No. 27).

**I.   The Individuals with Disabilities Education Act ("IDEA")**

This matter is governed by the Individuals with Disabilities Education Act, commonly called "IDEA." IDEA guarantees to all public-school students a free appropriate public education, or "FAPE." 20 U.S.C. § 1412(a)(1)(A). A FAPE obligates schools to provide such students "meaningful access to the educational process" in "the least restrictive environment" that is "reasonably calculated to confer 'some educational benefit.'" *E.S. v. Smith*, No. PWG-17-3031, 2018 WL 3533548, at *2 (D. Md. July 23, 2018) (citing *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014)). Although "the benefit conferred . . . must

amount to more than trivial progress," IDEA "does not require that a school district provide a disabled child with the best possible education." *M.C.*, 2014 WL 7404576 at *1; *see Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994). As to provision of FAPE, IDEA also strongly disfavors removing a disabled child completely from the general education setting. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). Whenever possible, "IDEA requires that children with disabilities receive education in the regular classroom" as opposed to exclusively with disabled peers. *Id.* at 999 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 202 (1982)); *see also* 20 U.S.C. § 1412(a)(5).

As part of the procedural protections afforded under IDEA to students and their parents, public schools must implement for each covered student an individualized educational plan ("IEP"). A sufficient IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. That is, an IEP must be crafted such that the child may "achieve passing marks and advance from grade to grade." *Id.* at 999 (quoting *Rowley*, 458 U.S. at 203–04) (internal quotation marks omitted). To this end, the IEP must address the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in an inclusive school classroom with non-disabled students. *See M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see also J.R. v. Smith*, No. DKC-16-1633, 2017 WL 3592453, at *1 (D. Md. Aug. 21, 2017).

Parents play a critical role in the IEP process. They have the opportunity to participate in crafting the IEP and modifying it as the student's needs change. *See* 20 U.S.C. § 1414(d)(1)(B);

*see also M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002). The parents are integral members of the IEP team.

Once an IEP is finalized, a parent may accept or reject it. If the parents reject the IEP as failing to provide a FAPE, the parents may secure additional educational services, including placement in a private school, and next request a Due Process Hearing before a state Administrative Law Judge. *See E.S.*, 2018 WL 3533548, at *2 (quoting 20 U.S.C. § 1412(a)(1)(C)(iii) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)). At a Due Process Hearing, the parents bear the burden of proving by a preponderance of the evidence that the student cannot receive FAPE without the accommodations requested by the parents. The ALJ hears the testimony of lay and expert witnesses, receives documentary evidence, and ultimately issues a written decision with findings of fact and conclusions of law. 34 C.F.R. § 300.512(a)(5); Md. Code Ann., Educ. § 8-413(h). Either party may challenge the ALJ's final decision by filing suit in a district court of the United States or the appropriate state court. 20 U.S.C. § 1415(i)(2).

With this procedural backdrop in mind, the Court turns to this case.

## II.     Background[1]

J.P. is a middle school student who has lived in Montgomery County since 2013. P. Ex. 2 at 2. From an early age, J.P. exhibited limited interest in other children and did not speak at all in daycare. *Id.* At four years old, and while living and attending preschool in Massachusetts, J.P. had "difficulty following classroom routines and meeting developmental expectations." *Id.* After evaluation, educators concluded that J.P. suffered from delays in fine motor, social, and

---

[1] Factual citations are to the underlying administrative record and are also generally consistent with the ALJ's findings of fact. Citations to the record conform to the following format: the Parent's exhibits appear as "P. Ex. __"; MCPS' exhibits as "MCPS Ex. __"; the transcript as "Tr. __"; and the ALJ Decision as "ALJ Op. __."

self-help skills, and he required special education services. *Id.* His initial IEP provided that J.P. be placed, for three and a half hours a day, in an integrated special education preschool program and receive occupational and speech therapy services. *Id.*

In 2013, when J.P. was five, he and his family moved to Montgomery County, Maryland. P. Ex. 2 at 2. Coinciding with the move and to address outstanding concerns about J.P.'s educational and behavioral delays, the Parents hired a child psychologist, Dr. Joseph Moldover, to perform a neuropsychological evaluation on J.P. P. Ex. 2 at 2–3. Dr. Moldover diagnosed J.P. with Communication Disorder, Selective Mutism, and Social (Pragmatic) Communication Disorder. Tr. at 569–70; P. Ex. 2 at 3. With the input of this evaluation, and as set forth in his IEPs, MCPS placed J.P. in a general education classroom with "pull-out services" for reading, writing, and occupational and speech therapy. P. Ex. 2 at 3. The IEP also provided for such accommodations as additional time for assignments and tests, frequent breaks, repeating of instructions and prompts, and the use of study aids. P. Ex. 2 at 3–4.

In 2016, J.P. underwent a second psychological evaluation in which he was diagnosed with Attention-Deficit/Hyperactivity Disorder, Social Anxiety Disorder, and some symptoms associated with Autism Spectrum Disorder ("ASD"). P. Ex. 2 at 4; *see also* MCPS Exs. 35; 36. Teacher evaluations for this academic year also described J.P. as failing to adequately achieve milestones in such subjects as math calculations, oral and written expression, and reading comprehension. P. Ex. 2 at 4; MCPS Ex. 6. As a result, all stakeholders, including the Parents, agreed to modify the IEP to provide additional special education supports and pull-out services. P. Ex. 2 at 4.

In the 2017–2018 school year, J.P.'s performance in fourth grade was mixed. He progressed in reading comprehension, written language content, and speech and language

pragmatics.  MCPS Ex. 1. at 5–6.  But behaviorally, his "level of engagement, participation and attention varied."  P. Ex. 2 at 4.  J.P. also struggled at home and school with "initiation, self-motivation, organization, memory for due dates, and attention and focus."  P. Ex. 2 at 4.  His confidence waned, and he began to withdraw socially.  *Id.*; *see also* MCPS Ex. 1 at 5–7.

In response to J.P.'s increasing difficulties at MCPS, the Parents enrolled him at McLean School for fifth grade, the 2018–2019 school year.  McLean School is a private educational institution with small class sizes and an emphasis on individualized attention to students.  *See* Tr. at 131–32.  McLean School is not a state-approved special education school, but a majority of students who attend the school learn with the aid of an IEP and specialized services from the McLean staff.  *See id.*  The Parents wanted J.P. to benefit from the small class sizes and in-class learning supports offered at McLean.  P. Ex. 2 at 5; Tr. at 572–75.  J.P.'s parents also enlisted the help of their next-door neighbor, local high school student Cameron Buckingham, to support J.P.'s learning at home.  Tr. at 574–75.

At McLean, J.P. struggled academically and socially.  In class, he required extra time on tests and assignments, frequent redirection, and help with organization.  *See* MCPS Ex. 33.  J.P. also rarely spoke in school and lacked meaningful interactions with peers.  *See id.*; P. Ex. 2 at 5.  Accordingly, the Parents retained Dr. Jaime L. Hopkins to perform a psycho-educational evaluation on J.P.  Dr. Hopkins concluded that J.P. suffers from ADHD and ASD.  P. Ex. 2 at 17–18.  Dr. Hopkins noted J.P.'s difficulty with inattention and focus, communication and interaction, and self-regulation.  *See generally* P. Ex. 2.

In September 2019, J.P. returned to MCPS for his sixth grade year.  The operative IEP identified his primary disability as Other Health Impairment.  MCPS Ex 6 at 1.  J.P. attended Hoover Middle School with an hours-based special education program created by the IEP team.

5

*Id.* The program provided both integrated and self-contained instruction to address his deficits in written expression, math problem solving skills, and executive functioning, as well as his behavioral challenges. *See* MCPS Ex. 6 at 1–7. Specifically, J.P. attended English, math, social studies, and science class with non-disabled peers, had 50 minutes a day of instruction in a self-contained resource classroom, and for "elective" classes such as art or gym class and lunch, J.P. was integrated with non-disabled peers. MCPS Ex. 6 at 25–26. The IEP also provided for an array of supplementary aids and services to be implemented as needed. *See id.* at 8–16. The Parents continued tutoring services with Buckingham at home.

Once again, the school year proved challenging for J.P. During the fall of 2019, J.P. began refusing to complete school and homework, and instead would tear up written assignments. *E.g.*, P. Ex. 6. He would grow easily frustrated, go limp on the floor, and would not talk. *E.g.*, P. Ex. 6 at 26, 32–33; Tr. at 596–604. Predictably, J.P.'s academics suffered. P. Ex. 6 at 33; MCPS Ex. 32. Although J.P. had made "sufficient progress" on the IEP's stated academic goals, he had only scored 30/60 on an English progress check in the second quarter and 11/19 on math. P. Ex. 9 at 2. As for his self-management, J.P. had not made sufficient progress in that he could not take out his work materials independently, often did not complete his work, and would not ask for help until an adult approached him. MCPS Ex. 8 at 23–25. Across all subjects, J.P. struggled with organization, focus, and completion of assignments.

During this time, the Parents stayed in constant communication with MCPS educators, who found themselves at a loss for how to motivate J.P. *See* P. Exs. 6, 8. The Parents communicated particularly that J.P. had expressed that he "hates school" and was refusing to do work at home. P. Ex. 6 at 31; *see* P. Exs. 6 & 8; Tr. at 596–621. Accordingly, in March 2020, the Parents retained education consultant Dr. Laura Solomon to assess J.P. and provide

6

recommendations for educational programming going forward. P. Ex. 11 at 2.

That same month, the COVID-19 pandemic necessitated that MCPS transition to a completely virtual educational platform. MCPS promptly created a Distance Learning IEP for J.P. This IEP set specific goals for J.P. in written language, math problem solving, and other skills that could be reasonably accomplished in a remote learning environment. *See* MCPS Ex. 10. J.P. initially responded poorly to remote learning. He could not sustain online attention for the 50-minute class times and required constant attention. Tr. at 794. The Parents, in turn, continued to pay Buckingham to assist J.P. Tr. at 776–784. With Buckingham, J.P. was "quite productive" for the spring 2020 semester, although he required constant breaks and prompting. *Id.* at 779–82, 815–16. For that semester, J.P. made modest academic progress, but still struggled emotionally, socially, and behaviorally. *See, e.g.*, MCPS Ex. 8 at 23–25; Tr. at 622–625; P. Ex. 8.

To prepare for the 2020–2021 school year, MCPS' IEP team met with the Parents and Dr. Solomon on two occasions. Dr. Solomon stressed that because the 2019 IEP did not reflect J.P.'s ASD diagnosis, he had not received appropriate services keyed to his individual needs. P. Ex. 11 at 3. At Dr. Solomon's urging, MCPS amended the IEP to reflect his ASD. MCPS Ex. 11; P. Ex. 11 at 3. MCPS also proposed that for the following year, J.P. be placed in general education courses with special education support for four hours and ten minutes per day, and one 50-minute self-contained special education course per day. The IEP did not recommend any autism-specific programming. MCPS Ex. 13 at 32–34.

MCPS also did not evaluate J.P. specifically as to his ASD, nor did the team members include anyone from MCPS' autism team. Tr. at 1165, 1652; P. Ex. 11 at 3; ALJ Op. at 49. As a result, the Parents rejected the proposed IEP and instead urged MCPS to place J.P. in an autism

program; specifically, they suggested consideration for the Autism Resource Services Program ("the ARS program") housed at Westland Middle School.  P. Ex. 1 at 5; MCPS Ex. 11; P. Ex. 9; Tr. at 86–88.  MCPS rejected the Parents' counter proposal and informed them of their rights to request a Due Process Hearing.  *See* MCPS Ex. 11; Tr. at 632–633,1165–1167.

The 2020–2021 school year began completely virtual with J.P. nominally assigned to Hoover Middle School.  Tr. at 637–38.  The Parents also rehired Buckingham to assist on a daily basis with J.P.'s virtual learning program.  *See* Tr. at 793.  In Buckingham's estimation, J.P.'s behavioral challenges escalated during this time.  He became agitated and refused to connect for his virtual learning sessions, destroyed homework assignments, hid under furniture to avoid assignments, and hit and growled at Buckingham.  Tr. at 793–833.  He required constant attention and prompting to accomplish any learning task.  *Id.*  The Parents communicated at length with MCPS about J.P.'s regression.  P. Exs. 12, 14; MCPS Ex. 45.

On September 21, 2020, the Parents requested that MCPS modify J.P.'s IEP to allow for placement at Ivymount School, a private learning institution which specializes in students suffering from ASD and ADHD.  Tr. at 376–77; P. Ex. 15.  MCPS denied the request.  MCPS Ex. 14; P. Exs. 15, 16.  The Parents responded, supplementing with Dr. Solomon's August 2020 evaluation that documented J.P.'s diagnosis and recommended full-time placement in a program akin to Ivymount.  MCPS Ex. 16; P. Ex. 11.  While the IEP team coordinated a follow-up meeting about J.P.'s educational plan, MCPS Exs. 17–19, the Parents withdrew J.P. from MCPS and enrolled him at Ivymount School.  P. Ex. 15.  He started classes at Ivymount on October 5, 2020.  P. Exs. 15; 1 at 6; *see* Tr. at 650.

Thereafter, the MCPS IEP team along with a specialist from the ARS program, Dr. Solomon, and the Parents met on November 2 and December 11, 2020, to review and revise the

June 2020 IEP. MCPS Exs. 19; 24; 25 at 3. At these meetings, the MCPS IEP team suggested modifying the IEP to provide J.P. four hours and ten minutes of special education classes outside of the general classroom program each day, and two 30-minute sessions of counseling monthly. MCPS Ex. 26 at 37–38. Most relevant, MCPS recommended that J.P. be placed in the very MCPS program that the Parents had suggested earlier that year—the ARS program at Westland Middle School. *Id.*; MCPS Ex. 25; *cf.* P. Ex. 9; Tr. at 632–33. The Parents rejected the proposed modifications, and instead kept J.P. at Ivymount for the remainder of that year. MCPS Ex. 25; P. Ex. 1 at 7.

MCPS finalized the December 2020 IEP to incorporate placement in the ARS program. But the IEP specifically, and erroneously, provided for five self-contained classes—math, English, science, social studies, and resource—instead of three for only math, English, and resource. MCPS Exs. 26 at 37; 27; 28. MCPS, upon learning of the error, issued a revised IEP on March 13, 2021. *See* MCPS Exs. 27; 28. The change thus reflected that J.P. would spend roughly forty percent of his school day in general education classes but with autism-specific supports, experienced co-educators, and other pertinent assistive tools. MCPS Exs. 27; 28 at 38.

In the interim, the Parents filed their Due Process Complaint on January 4, 2021, challenging the December IEP and seeking reimbursement for placement at Ivymount. P. Ex. 1. Once MCPS corrected the December 2020 IEP, the Parents refiled their Due Process Complaint on March 30, 2021. *Id.* On June 1, 2021, Administrative Law Judge Joy L. Phillips of the Maryland Office of Administrative Hearings commenced a Due Process Hearing that lasted eight days and included testimony from eight witnesses. ALJ Op. at 2.

On July 15, 2021, the ALJ issued a written decision finding for the Parents in part ("the Decision"). ALJ Op. at 52–56. Specifically, the Decision concluded that MCPS had denied J.P.

a FAPE for the first semester of the 2020–2021 school year, *id.* at 52–54, but thereafter—and pursuant to the December 11, 2020 IEP which recommended placement in Westland Middle School's ARS program—MCPS had provided J.P. a FAPE. Accordingly, the ALJ awarded reimbursement for placement at Ivymount through mid-January 2021 but denied all other requested relief. *Id.*

The Parents next filed suit in this Court, appealing only the ALJ's decision that MCPS provided J.P. a FAPE as of December 2020. ECF No. 1. MCPS contends that the ALJ's decision was correct and asks that it be affirmed entirely.[2] *See* ECF No. 27. For the following reasons, the Court agrees with MCPS.

### III. Standard of Review

This Court conducts a "modified de novo review," of the ALJ's determination, giving "due weight to the underlying administrative proceedings." *M.M.*, 303 F.3d at 530–31 (citation omitted); *see also T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 572 (4th Cir. 2018); *Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004). Findings of fact "made in a regular manner and [with] evidentiary support[]" are presumed correct. *Wagner*, 340 F. Supp. 2d at 611 (quoting *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446, 457 (D. Md. 1999)). Where a reviewing court does not adhere to such factual findings, the court must explain its reasons for crediting facts different than those on which the ALJ relied. *M.M.*, 303 F.3d at 531 (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)).

---

[2] MCPS spills much ink arguing that because the June 2020 IEP provided a FAPE to J.P., placement at Ivymount was never warranted. *See* ECF No. 27-1 at 21–25. Yet MCPS has not elected to cross appeal the ALJ's finding in the Parents' favor regarding the placement between October 5, 2020, and mid-January 2021, and explicitly notes that "Defendants will be consistent in the deference that they give to the ALJ." *Id.* at 25. Thus, the Court will treat as uncontested the ALJ's finding that the June 2020 IEP was insufficient.

Having accorded the ALJ's findings of fact proper deference, the Court is then "free to decide the case on the preponderance of the evidence." *Doyle*, 953 F.2d at 105. The Court may, for example, "believe[] that the evidence considered as a whole point[s] to a different legal conclusion." *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). In making its determination, however, this Court must not substitute its "own notions of sound educational policy for those of the school authorities." *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206). Pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014). The moving party bears the burden of demonstrating the propriety of the relief sought. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party to determine whether any disputed issue of material fact precludes entering judgment in the movant's favor. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "Where, as here, cross-motions for summary judgment are filed, a court must 'evaluate each party's motion on its own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cnty. Pub. Sch.*, No. DKC-2008-

1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (alteration in original) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### IV. Analysis

The Parents narrowly challenge only that aspect of the Decision concluding that the December 2020 IEP provided J.P. a FAPE.  The Parents raise four grounds for error.  First, the Parents argue that the ALJ overlooked critical portions of Dr. Solomon's opinion that J.P. should remain at Ivymount.  ECF No. 23-1 at 19–23.  Second, the Parents maintain that the ALJ ignored that the December 2020 IEP would have returned J.P. to the same environment that he had failed the year earlier.  *Id.* at 23–26.  Third, the Parents argue that the ALJ failed to consider the harmful impact of a delayed mid-year school transition.  *Id.* at 26–30.  Last, the Parents contend that the ALJ erred in concluding that MCPS' clerical error in the December 2020 IEP had been harmless.  *Id.* at 31.  The Court considers each argument in turn.

#### A. The ALJ's Treatment of Dr. Solomon's Opinion

First, the Parents challenge that the ALJ overlooked the gravamen of Dr. Solomon's opinion that the ARS program would not provide a sufficiently autism-specific program to meet J.P.'s educational needs.  The Parents more particularly fault the ALJ for highlighting that Dr. Solomon had, at one time, praised the ARS program and that the doctor's concern about the ARS program focused solely on the difficulty inherent in a mid-school year transition.  ECF No. 23-1 at 20–23.  Thus, say the Parents, the ALJ clearly erred in misconstruing Dr. Solomon's expert opinion.  *Id.*

In reviewing the ALJ's decision, "findings of fact . . . made in a regular manner and with evidentiary support are entitled to presumptive validity." *Doyle*, 953 F.2d at 105.  By contrast, findings not "regularly made," are entitled to no deference.  *Id.*  The Court considers the process

in which the ALJ engaged to ascertain whether the findings were regularly made. *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008). Findings are accorded deference when made after a full and fair evidentiary hearing, with the ALJ resolving factual disputes "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.*; *see also Doyle*, 953 F.2d at 104 (holding that a reviewing court should generally not "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility") (internal citation omitted).

      As to the ALJ's assessment of Dr. Solomon's recommendation, the Court cannot conclude that the findings were irregularly made. The ALJ recognized and credited Dr. Solomon's opinion that J.P. required autism-specific programming. The Decision plainly acknowledged, as did Dr. Solomon, that "Ivymount provides a level of individual attention that many public schools cannot." ALJ Op. at 53. Nonetheless, even accounting for that reality, the ALJ concluded that the ARS program could adequately provide J.P. a FAPE. As the ALJ emphasized, "[i]n the ARS program, [J.P.] would have been paired with other children with the same diagnosis and with teachers trained specifically to educate children with [a]utism. He would have received more frequent, intense adult support across all classes," from a program which Dr. Solomon had endorsed for J.P. just months prior. *Id.* Based on this, the ALJ found that the ARS program would provide a sufficiently specialized autism program in the least restrictive environment. *See id.* The Decision, in essence, acknowledged and considered Dr. Solomon's views in total, but ultimately disagreed as to the necessity for Ivymount over ARS. *See id.* Simply put, the ALJ fairly considered Dr. Solomon's views but found they did not align with provision of a FAPE.

To be sure, the record plainly reflects that Dr. Solomon did not agree with the December 2020 IEP and that in her estimation, J.P. required full-time special education in a self-contained setting. *See* Tr. at 110–13, 294. But nothing in the record supports that the ALJ failed to consider this testimony. To the contrary, the record indicates that the ALJ allowed Dr. Solomon to testify at length about her assessment of the December 2020 IEP and be called a second time as a rebuttal witness. *Id.*; Tr. at 1645–68. That the ALJ credited Dr. Solomon's testimony in part does not mean that her disagreement elsewhere renders the finding irregularly made. Accordingly, the ALJ's treatment of Dr. Solomon's opinion does not render the Decision infirm. *See S.T. ex rel. S.J.P.T. v. Howard Cnty. Pub. Sch. Sys.*, No. JFM-14-00701, 2015 WL 72233, at *2 (D. Md. Jan. 5, 2015) (ALJ's findings entitled to deference even where facts are "poorly explained" so long as ALJ has engaged in standard fact-finding methodology), *aff'd*, 627 F. App'x 255 (4th Cir. 2016).

**B. ALJ Erred in Concluding the December 2020 IEP Provided a FAPE**

The Parents next argue that the ALJ erred in concluding that the December 2020 IEP provided a FAPE because the record otherwise supports that J.P required autism-specific programming across the board and in a self-contained setting. ECF No. 23-1 at 23–25. Provision of a FAPE generally requires that the recommended educational program set forth in the IEP is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade," in the least restrictive environment. *Endrew F.*, 137 S. Ct. at 996 (quoting *Rowley*, 458 U.S. at 204). In concluding that the December 2020 IEP did just that, the ALJ highlighted that the ARS program provided "exactly what Dr. Solomon was recommending in June." ALJ Op. at 53. J.P. "would have been paired with other children with the same diagnosis and with teachers trained specifically to educate children with autism." *Id.* Thus, the

ARS program was sufficiently specialized to address J.P.'s learning differences in the least restrictive environment.

This conclusion is amply supported by the record. MCPS' expert, Robin Daisy, testified that the ARS program provides an autism-specific curriculum that is both tailored to J.P. and integrative, as FAPE requires. Tr. at 1525–66. Daisy explained the importance and implementation of academic rigor, access to general education peers, modifications to address his specific learning challenges, and how the ARS program would have met the benchmarks for each of these goals while providing J.P. individualized attention and support. *See id.* This testimony alone supports the ALJ's conclusion that the December 2020 IEP corrected the deficiencies in the June 2020 IEP and would have provided J.P. a FAPE.

The Parents respond that the December 2020 IEP offered "essentially more of the same" as in prior years, when MCPS had not adequately met J.P.'s educational needs. ECF No. 23-1 at 25. This position distorts the record. The December 2020 IEP was not "more of the same" in one critical way—until December 2020, MCPS did not incorporate into the IEP autism-specific programming. By contrast, the December 2020 IEP provided that which the Parents and Dr. Solomon previously urged: placement in an autism-specific program. Thus, because the ALJ's conclusion that the December 2020 IEP provided a FAPE is grounded in the record evidence, the Parents' challenge must be rejected.

**C. Impact of Mid-School Year Transition**

Likewise, the Parents' contention that the ALJ failed to consider the impact of a mid-school year transition is unsupportable. ECF No. 23-1 at 26. The ALJ expressly reasoned that although the "transition from Ivymount to Westland would have been difficult and the move might have disappointed the Student," *id.* at 53, J.P. "had made successful transitions

15

previously." *Id*. The Decision particularly relied on Dr. Hopkins' 2019 evaluation in which she described J.P. as "resilient" and as responding favorably to new settings. ALJ Op. at 53; *see also* P. Ex. 2 at 21. Further, the Decision reasoned that any such difficulty in transition could be mitigated by implementing other accommodations such as advance meetings with teachers, online class observations, and the expertise of ARS faculty specifically trained and experienced in helping students adjust to the ARS program from other schools. ALJ Op. at 54. Although the Parents may disagree with the ALJ's conclusion, it is factually supported and will not be disturbed.

### D. Error in December 2020 IEP Harmless

Lastly, the Parents argue that the ALJ erred in finding harmless the December 2020 IEP's misstatement regarding the number of classes for which J.P would receive self-contained instruction. As to this, the ALJ concluded that because the Parents "were not going to move [J.P.] out of Ivymount regardless of the new ARS placement or the number of self-contained classes he would be in," the error "made no difference at all." ALJ Op. at 53. "In matters alleging a procedural violation," an ALJ "may find that a child did not receive a [FAPE]" if the ALJ determines that a procedural right was violated and that the violation "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child." 20 U.S.C. § 1415(f)(3)(E)(ii)(II). But absent a finding that the procedural violation led to the substantive denial of FAPE, then the remedy for the violation is limited to rectifying the error. *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 248 (4th Cir. 2019).

The ALJ did not err in concluding that any such procedural violation was harmless. No doubt, the Parents generally retain the right to receive a correct IEP to allow meaningful

16

participation in the educational decision-making process. *See* 20 U.S.C. § 1415(b). But given that the Parents had rejected *any* placement that was not Ivymount, it did not matter the contours of the ARS program. *See* ALJ Op. at 54. This is especially so given that the Parents believed J.P. required a full-time, self-contained autism program. The original, erroneous IEP had provided that J.P. would have received such accommodation for nearly two-thirds of every school day, and still, the Parents rejected the IEP. Given that the IEP most aligning with the Parents' views had already been rejected, the ALJ could fairly conclude that the error and its correction did not affect the Parents' decision-making process.

### IV. Conclusion

In sum, the Court finds no error in the ALJ's decision. Although the Parents understandably believe that Ivymount affords J.P. a superlative education, that is not the standard under IDEA. Rather, where, as here, MCPS provided programming reasonably designed to deliver a free appropriate public education to J.P., MCPS has met the requirements of IDEA. *See M.M.*, 303 F.3d at 526. Accordingly, the Parents' motion for summary judgment is denied and MCPS' motion is granted. A separate order follows.

| 9/29/2022 | /S/ |
|---|---|
| Date | Paula Xinis<br>United States District Judge |